## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:04cv136

| | | |
|---|---|---|
| EARNESTINE SHEPHERD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court in accordance with 28, United States Code, Section 636(b), and upon plaintiff's Motion for Summary Judgment, defendant's Motion for Summary Judgment, and plaintiff's Motion to Compel.  For the reasons discussed below, the undersigned will recommend that plaintiff's Motion for Summary Judgment be denied, defendant's Motion for Summary Judgment be granted, and that the Motion to Compel be denied.

## FINDINGS AND CONCLUSIONS

### I.    Background

### A.    Relevant Medical History

Plaintiff was employed by Honeywell International, Inc., as a small switch adjuster, assembling a "limited number of parts" and performed " several internal and external operations to adjust travel and force characteristics" of switches and components. Administrative Record ("A.R."), at 88 & 108.  According to Honeywell, this was an eight hour a day job, requiring seven to eight hours of sitting, one to two hours of standing or walking, repetitive use of hands seven to eight hours a day with simple or light grasping and fine finger dexterity, and three to four hours a day in use of the head and neck in twisting and

looking down.  A.R., at 90 & 110.

Beginning in 1985, plaintiff was treated for carpal tunnel syndrome, had a lumbar laminectomy in 1989, an epidural lumbar therapeutic block in 1993, and epidural steroid injection in 2000 and physical therapy, and a cervical therapeutic block in 2001.  Beginning in October 2001, plaintiff became a patient of Dr. Margaret O. Burke, M.D., a neurologist. Plaintiff's visits and Dr. Burke's clinical notes are found in the Administrative Record at pages 634 through 650, and are fairly and accurately summarized by defendant in its brief at pages seven through nine.  Between October 2001 and August 2002, the notes indicate complaints of persistent pain, but also reflect Dr. Burke's clinical findings, such as "strength is normal 5/5 . . . . mild distress . . . . full range of motion of the shoulders, except internal rotation of the left shoulder, which is  mildly impaired . . . ."  A.R., at 639 & 646.  In plaintiff's visit of August 9, 2002, Dr. Burke observed:

> The patient is well developed, well nourished, adult woman in no acute distress.  She has tenderness over the left cervical paraspinal muscles and trapezius ridge, with full range of motion of the upper extremities.  On manual muscle testing, she has 5- weakness of left pronation; other normal 5/5.
>
> * * *
> Her last CT scan of the cervical spine on 8/27/01 showed a moderately large, left sided disk extrusion at C5-6.  She has been through a rheumatological work-up, which did not show inflammatory arthritis . . . .

A.R., at 650.  Dr. Burke then ordered an MRI, and referred plaintiff to a colleague, Dr. Jon Silver, a neurosurgeon.  Dr. Jon Silver's notes of his initial consultation with plaintiff provide a snapshot of plaintiff's impairments, activities, and therapies as they existed on September 5, 2002:

> history of lumbar degenerative disk disease but no other major health problems apparently has about a two year history of progressive pain in the neck, left shoulder with pain and numbness radiating down the left arm into the hand, mainly on the thumb, index and middle finger side.  She says it would come at the end of a long work week with heavy activity with driving . . . . has tried numerous therapies over the past couple of years . . . .  While her pain is

tolerable, it is never really improved to the point where she is comfortable . . . . cervical MRI shows a large osteophyte with disk to the right at C6-7 . . . . PLAN C5-6 and C6-7 ACDF [fusion].

A.R., at 654-657. Dr. Jon Silver performed the fusion on October 3, 2002, without complications, and the follow up notes indicate a positive outcome. A.R., at 664 & 665. On November 4, 2002, Dr. Jon Silver noted "disability dates" beginning October 3, 2002, and "ending date *01/08/03 approx. . . .Further recommendations regarding work status will be made at next appt*" A.R., at 665. At the next appointment on January 8, 2003, which was set for making recommendations regarding plaintiff's work status, Dr. Jon Silver noted the following:

> The patient had been improving and now is having significantly worse neck and arm pain. **I am not sure what to make of this**. Her grafts appear to be incorporating well. There is no evidence of pseudoarthrosis.

A.R., at 667 (emphasis added). Over the next six months of 2003, Dr. Jon Silver ordered a battery of tests all of which showed that the surgery successfully decompressed the nerve root and C5-6 and C6-7 levels. A.R., at 668, 672, 677, & 682. After these tests failed to show any basis for plaintiff's reports of "progressive pain," that happened to coincide with the closure of the post-operative disability period Dr. Jon Silver had allowed, he then referred plaintiff back to Dr. Burke in August 2003. On June 23, 2203, Dr. Jon Silver recommended to plaintiff that she have a Functional Capacity Evaluation (hereinafter "FCE"):

> PLAN: We will obtain a cervical myelogram/CT, as well as C-spine flexion/extension films. **We will also obtain an FCE**. Based on these studies, we can make further recommendations. Overall, if there is not anything found that requires further surgical intervention, I think the only thing left to do would be to have her see Dr. Burke back for further rehab treatment.

A.R., at 677 (emphasis added). Dr. Burke noted on plaintiff's return to her care that plaintiff had a

> functional capacity evaluation on July 25, and this showed that she was performing at submaximal effort, therefore I really feel that she will need

further intervention before she can be at maximum medical improvement.
A.R., at 814.

A complete examination of the administrative record fails to reveal this FCE and evidently it was not submitted to the plan administrator. Over the next several months, Dr. Burke provided nonsurgical care which included trigger point injections, physical therapy, and prescription medication for headaches. Dr. Jon Silver then followed up his surgical intervention with an examination on January 13, 2004, noting that the surgical wound had healed, that she had normal strength bilaterally, but that plaintiff was still having " a lot of neck and proximal trapezius type pain," and that based on testing "there is really nothing dramatic in terms of nerve root compression . . . ." A.R., at 809.

On June 16, 2004, defendant referred plaintiff's claim to Network Medical Review for review by a specialist orthopedic surgery. Defendant characterized such review as an "independent review." Plaintiff's claim was reviewed by Dr. Richard A. Silver, who concluded that plaintiff was capable of "working in light duty without restrictions, modifications, or limitations.' A.R., at 843. In reaching that medical-vocational conclusion, the consulting physician summarized the clinical notes of plaintiff's neurologist and neurosurgeon, finding that plaintiff's "subjective complaints are unsubstantiated by objective clinical findings that show any loss of functionality." Id.

**B.      Procedural History of Plaintiff's Claim for LTD Benefits**

Commencing with the day of her surgery, October 3, 2002, plaintiff received short term disability benefits for the following six months. Upon expiration of her short term disability benefits on or about April 3, 2003, plaintiff applied for long term disability benefits ("LTD benefits"), citing inability to perform her job at Honeywell as an assembler. Defendant denied this claim on May 13, 2003, explaining that there "is little medical on file

and no evidence of impairment which would preclude RTW [return to work]." A.R., at 865. Plaintiff timely appealed this decision on June 2, 2003, and on July 3, 2003, referred plaintiff's claim to Dr. Amy Hopkins, M.D., for review.

On July 14, 2003, Dr. Hopkins reviewed the notes of Dr. Jon Silver from plaintiff's office visit of March 3, 2003, as well as a form he filled out on April 3, 2003, based on the that office visit. After discussing such post-operative history and Dr. Jon Silver's observations, Dr. Hopkins commented that there was "no actual objective evidence in this record of any functional impairment which would have prevented EE [plaintiff] from performing the material duties of her own occupation as of April 3, 2003." A.R., at 72. The undersigned notes that counsel for plaintiff argues at this point that "[t]here is no evidence that Metlife gave her [Dr. Hopkins] a description of Plaintiff's occupation." Plaintiff's Brief in Support, at 5. This argument is not accurate inasmuch as the Administrative Record clearly shows that defendant sent Dr. Hopkins a document captioned "Metlife Disability IPC Referral Form," A.R., at 73, that such document included a description of plaintiff's work as "light assembly work," A.R., at 74, and that Dr. Hopkins actually received such document as evidenced by her signature at the end of such document. Id. By letter dated July 15, 2003, defendant upheld its earlier decisions denying plaintiff's claim.

It is at this point that plaintiff retained counsel to assist in her administrative review. Nearly six months after the July 15, 2003, denial, counsel for plaintiff filed the second request for reconsideration and submitted addition medical evidence. A.R., at 625-28. On January 27, 2004, counsel for plaintiff supplemented her appeal with additional medical records. See A.R., at 807-16. As discussed above, defendant referred plaintiff's claim to Dr. Richard A Silver on June 16, 2004. Defendant denied the second appeal on July 15, 2004, citing the findings of Dr. Richard A. Silver, dated July 1, 2004, as amended July 14,

2004.[1]  See A.R., at 840 & 843.  Such denial was in the form of a six-page letter, and constitutes the final decision of the Plan Administrator.  A.R., at 827-32.

## II.      Plaintiff's Motion to Compel

Plaintiff has filed a Motion to Compel defendant to produce certain material responsive to her Second Set of Interrogatories and Document Requests.  Materially, interrogatories three through seven seek information concerning a potential conflict of interest (i.e., providing medical review services to the insurance industry) as to the medical experts defendant employed in its administrative review.

A theme throughout plaintiff's argument is that Doctors Hopkins and Richard A. Silver were biased in that they provided services almost exclusively to the insurance industry.  Undoubtedly, there are some doctors who will routinely render an opinion favorable to a plaintiff and others who will routinely give an opinion favorable to defendants.  The personal biases or predilections of doctors or consultants is not an issue under ERISA; rather, the only issue is whether the Plan Administrator properly did his job.  As the district court has unequivocally held:

> it is not the conflict of interest of a consultant employed by a fiduciary that the Fourth Circuit has held is relevant . . . it is the conflict of the fiduciary.

Abromitis v. Continental Cas. Co., 261 F.Supp.2d 388, 390 (W.D.N.C. 2003), aff'd, 114 Fed.Appx.57 (4th Cir. 2004).  Where plaintiff argues that the plan administrator hired a biased consultative physician, the correct method of review would appear to be an increased scrutiny in the application of the sliding scale of review.  That scrutiny does not focus on the opinions of the consultant in other cases, but is inward, it that the court will closely review the

---

[1]      At the request of defendant for clarification as to when plaintiff was capable of return to work, Dr. Richard A. Silver issued an addendum stating that between April 4, 2003, and June 1, 2003, plaintiff was capable of a graduated return to work at the sedentary level, and was capable of full return to light work on June 1, 2003.

administrative record to determine if other evidence exists that contradicts the findings of the consultant, such as the opinions of a treating physician or a another consulting physician who actually performed a clinical examination of the plaintiff. This concept was, perhaps, better explained by the district court in <u>Chandler v. Underwriters Laboratories, Inc.</u>, 850 F.Supp. 728 (N.D.Ill.1994):

> As to . . . Parkside's internal notes, which Chandler argues show it to be a "hired gun," do not fairly support a conflict-of-interest characterization. Such an argument proves too much, for it might *always* be thought to be in the interest of a plan administrator or its consultants to deny benefit applications. Though to be sure such a "conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion' " (<u>Bruch</u>, 489 U.S. at 115, 109 S.Ct. at 956, citing Restatement (Second) of Trusts § 187, Comment d (1959)), that factor simply enters into the evaluation of the decision in arbitrary and capricious terms--as Donato, 19 F.3d at 380 n. 3 put it:
>> This is a variation on a theme . . . that the arbitrary and capricious standard of review is a sliding scale standard that should be more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is.

<u>Chandler v. Underwriters Laboratories, Inc.</u>, 850 F.Supp. 728 (N.D.Ill.1994)(citation and corresponding quotation marks omitted).

In any event, arguments as to the alleged bias of consultants is a slippery slope, as shown by plaintiff's argument in reply, which supports her Motion to Compel. Plaintiff argues that her research has found

> thirty-three (33) cases in which physicians affiliated with NMR performed medical reviews of disability claimants' claims. . . . In all 33 cases, the NMR physician issued a report unfavorable to the claimant.

Plaintiff's Reply, at 1-2. Here is the slippery slope: plaintiff's argument ignores the fact that reports "favorable" to a claimant are unlikely to be appealed to federal court, and that a predicate to a "claim" becoming a "case" *is* an unfavorable decision. Put another way, plaintiff's argument is analogous to an argument that the consulting doctors who provide opinions to the State Agency in Social Security cases are biased inasmuch as just about every

case involving such State Agency doctors that finds its way to federal court has an opinion adverse the claimant. Such a method of statistical accounting overlooks the overwhelming number of cases wherein benefits are awarded based on such doctors' opinions.

In any event, the undersigned is bound to follow the law of this circuit as found in Abromitis, and has sworn to do so no matter how appealing or commonsensical the method for evaluation suggested by the plaintiff. In conducting this review, the undersigned has slid the scale to the degree warranted by plaintiff's argument, and has reviewed the administrator's decision based on the entire administrative record, mindful of material that could possibly indicate bias and impartiality on the part of the administrator. Applying Abromitis, however, plaintiff's motion to compel must and will be denied.

## III. Standard Applicable to Cross Motions for Summary Judgment

In this case, the parties have submitted cross motions for summary judgment, wherein each side contends that there are no issues for trial and that judgment may be rendered as a matter of law. Finding that the facts are adequately presented in the administrative record, that the court's review is limited to the administrative record that was before the Plan Administrator, and that no genuine issues of material fact exist, summary judgment is an appropriate means to resolve the issues presented.

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

**IV.    Standard of Review Applicable to the Final Decision of the Claim Administrator**

    **A.    Governing Plan Document**

    As an initial matter, plaintiff argues that a dispute exists as to which document governs her claim for LTD benefits.  Apparently, there are two Plan documents:

    The first document (hereinafter "Plan One") bears the date of January 1, 2002, and is titled "Honeywell Long-Term Disability (LTD) Income Plan Summary Plan Description." In this document, Honeywell delegates its decision making authority to CIGNA.  <u>See</u> Attachment to Plaintiff's Brief, Ex. A.  The defendant contends that this is the governing plan.

    The second document (hereinafter "Plan Two") bears the date of June 1, 2002, and is titled "Your Employee Benefit Plan Honeywell International Inc. Long Term Disability Benefits."  In this document, Honeywell delegates its decision making authority to Met Life. On page "ii," the document provides a "Certificate of Insurance," and informs the beneficiary that "[t]his is your Certificate of Insurance for Long Term Disability Insurance," and "describes the benefits under the Plan in effect as of June 1, 2002.  Any prior Certificate relating to the coverage set forth herein is void."  Such state is thereafter signed by Robert H. Benmosche, Chairman, President and Chief Executive Officer of the defendant.  <u>See</u> Attachment to Plaintiff's Brief, Ex. B.  The plaintiff contends that this is the governing plan.

    In plaintiff's affidavit, she avers that she never received either document from her employer.  Aff. of Shepherd, at ¶ 2.

    Plan two was produced to plaintiff during the claims process, not by defendant, but by counsel for plaintiff's employer.  In a letter from Allison R. Klausner, Assistant General Counsel-Benefits, Honeywell, to plaintiff's counsel herein, dated September 10, 2003, such attorney states, as follows:

As per your letters dated August 11, 2003 and August 12, 2003, I am forwarding to you a copy of (1) the documents submitted to Honeywell from Ms. Shepherd's doctors regarding Ms. Shepherd; (2) Honeywell's job description for Adjuster-Small basic-Associate 3; and (3) the current draft of the MetLife policy which governs Ms. Shepherd's claim for disability. **Please note that the contract with MetLife has not been finalized. It is still undergoing internal review.**

A.R., at 527 (emphasis added).

While the July 15, 2004, final decision of the Plan Administrator, MetLife, does not specifically reference which Plan it was applying, review of the decision clearly indicates that the Plan Administrator reviewed plaintiff's claim under the January 2002 Plan One document. In its answer to plaintiff's First Interrogatory, defendant purportedly averred that it applied the Plan One document in deciding plaintiff's claim.[2]

The first issue is which Plan governs. It appears that defendant actually applied Plan One. The confusion appears to stem from Ms. Klausner's letter and her statement that the "*draft* of the MetLife policy . . . *governs* Ms. Shepherd's claim for disability." A.R., at 527 (emphasis added). Inasmuch as this letter is between attorneys, the court will apply the ordinary, legal meaning of "draft" as that term is defined by *Black's Law Dictionary*:

> A tentative, provisional, or preparatory writing out of any document . . . for purposes of discussion and correction , which is afterwards to be copied out in its final shape.

*Black's Law Dictionary*, 5th Ed. (1979, West Pub. Co., St. Paul). "Governs" means "to direct and control." Id. Review of the Administrative Record find no indication that after receipt of such letter that counsel for plaintiff sought clarification of such inconsistency from Ms. Klausner.

In substance, the two Plan documents differ in their definition of initial disability. The

---

[2]     While defendant states at page two of its brief that its answer to such interrogatory has been "filed contemporaneously" with its summary judgment materials, such interrogatory answer does not appear in the electronic record.

Plan One document looks to the employee's ability to perform "all the material duties of your

Regular Occupation or a Qualified Alternative" or unable to earn 80 percent of the

employee's Indexed base Monthly Salary.  The Plan Two document only looks to whether

the employee is able to "earn more than 80% of your Indexed Predisability Earnings at your

own Occupation for any employer in your Local Economy."  Both Plans clearly delegate to

the respective insurance companies the discretion to interpret the terms of the Plans.

Defendant's brief provides little explanation as to what happened to the second

document, simply arguing that

> [t]he Certificate of Insurance and draft SPD produced to Plaintiff during the
> Administrative Process and in Discovery unambiguously reflects MetLife has
> been substituted for Cigna as claims fiduciary and that Honeywell has
> delegated its discretionary authority to determine claims to MetLife.

Plaintiff's Brief, at 14. This "Certificate of Insurance," however, is included and indexed

within the Plan Two document, which defendant contends was only a draft.  Further, such

Certificate of Insurance states that this "Certificate describes the benefits under the Plan in

effect as of June 1, 2002.  Any prior Certificate relating to the coverage set forth herein is

void."  While defendant appears to be arguing that there are two June 2002 documents, the

Plan and the certificate,  the certificate appears only within the confines of Plan Two, which

defendant contends is a nullity.

In <u>Coleman v. Nationwide Life Ins. Co.</u>, 969 F.2d 54, 60 (4th Cir.1992), <u>cert. denied</u>,

505 U.S. 1081 (1993), the Court of Appeals for the Fourth Circuit held that a Plan participant

is not entitled to recover benefits to which she was not entitled under plain language of Plan

itself, simply because she claimed that Plan Administrator had made informal oral and

written representations to her indicating that she would receive such benefits which were not

implemented in conformity with the Plan's formal amendment procedure.  <u>Singer v. Black

& Decker Corp.</u>, 964 F.2d 1449, 1453-54 (4th Cir.1992) (Wilkinson, J., concurring).  As the

-12-

appellate court later held:

> to secure relief under ERISA based on representations in a summary plan description that are inconsistent with provisions of the other official plan documents, an ERISA claimant must demonstrate that he either relied upon or was prejudiced by those representations.

Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1478 (4th Cir. Md. 1996). Plaintiff makes no argument in her brief that she either relied upon the proposed June 1, 2002, Plan or that she was in any way prejudiced by Honeywell's representation. Rather, plaintiff appears to argue that the June 1, 2002, proposed Plan would be more favorable to her claim. Plaintiff makes no argument that she relied detrimentally on Honeywell's representation; instead, plaintiff appears to seek to benefit from a misstep of a representative of the employer rather than the Plan Administrator. For all practical purposes, this is the same type of thing that appellate court addressed in Stiltner v. Beretta U.S.A. Corp., supra.

Reading the administrative record and the final decision of the Plan Administrator in accordance with the teachings of the Court of Appeals for the Fourth Circuit, plaintiff cannot rely on a modification that was not implemented in conformity with the Plan One document. While defendant does not state as much in its argument, it appears implicitly to argue that the Plan Two document never made it out of draft form, was never implemented, and that Metlife was substituted for Cigna as a matter of course and as evidenced by the June 1, 2002, certificate of insurance.

Absent a showing of reliance or prejudice, the undersigned will find that the Plan Administrator properly employed the summary Plan One document in making his determination.

### B.      Standard of Review Applicable to the Plan One Document

Plaintiff states in her brief that she will stipulate to the applicability of Plan One being the applicable Plan document *if* the court will first find that such Plan document does not

provide for discretionary authority and impose a *de novo* standard, which would be more favorable to the plaintiff. This court does not bargain with litigants, but applies the law to the facts as they may appear in each case. The undersigned declines plaintiff's offer, and finds that not only is Plan One applicable, it unequivocally delegates discretion to the Plan Administrator to determine eligibility for benefits under the Plan. See Plaintiff's Brief, Ex. A, at 15. Plaintiff's argument that a *de novo* standard should be applied because CIGNA was the designated Plan Administrator rather than Metlife is unavailing inasmuch as Honeywell reserved the right to modify the Plan "at any time." Id.; see de Nobel v. Vitro Corp., 885 F.2d 1180, 1186-87 (4th Cir. 1989).

Where a Plan Administrator is granted discretionary authority by the terms of the Plan to determine eligibility or to construe the terms of the Plan, the denial of benefits must be reviewed for abuse of discretion. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989).

> Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently.

Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997). In determining whether discretion has been abused, the Court of Appeals for the Fourth Circuit has identified the following eight factors for consideration by a reviewing court:

(1)    the language of the Plan;

(2)    the purposes and goals of the Plan;

(3)    the adequacy of the materials considered to make the decision and the degree to which they support it;

(4)    whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan;

(5)      whether the decision-making process was reasoned and principled;

(6)      whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7)      any external standard relevant to the exercise of discretion; and

(8)      the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).  The district court has explained, as follows:

> there is a slight change in the deference afforded a plan fiduciary under this standard of review where the plan fiduciary is operating under a conflict of interest. Ellis, supra, at 233. The Supreme Court has recognized that where such a conflict of interest exists, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, supra (quotations omitted). The Fourth Circuit has explained that any conflict of interest is to be judged on a case-by-case basis, and should be regarded as one of several factors in reviewing whether the plan administrator had abused its discretion. Ellis, 126 F.3d at 233 (citing Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir.1996)). While the reviewing court should never deviate from an abuse of discretion standard, the Fourth Circuit has held that a lessened level of deference should be afforded a plan fiduciary operating under a conflict of interest. Bedrick, supra.

Boyd v. Liberty Life Assurance Co. of Boston, 362 F.Supp.2d 660, 664-65 (W.D.N.C. 2005) (Thornburg, J.).

Under ERISA, a Plan fiduciary is obligated to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).  ERISA anticipates that conflicts of interest are inherent in benefit determinations and provides that such conflicts be considered as a factor in determining whether there was an abuse of discretion by a Plan's administrator and fiduciary.  Ellis, supra, at 233.  Where a conflict is shown, the deference to the decision of the fiduciary "will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict."  Id.; accord Boyd, supra, at 665.

The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other Plan terms, the more

objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

Ellis, supra, at 233. Where, as here, it is satisfactorily shown that the decision maker has a financial interest that conflicts with its duties as a Plan fiduciary, see admin. trans, at 501, the "abuse-of-discretion" standard is modified on a sliding scale to counterbalance such impact. Bedrick v. Travelers Ins. Co., 93 F.3d 149 (4th Cir. 1996)(citations omitted). The modified abuse-of-discretion standard requires close judicial scrutiny of the Plan Administrator's decision. Holder v. Woodmen of the World, 2001 WL 369680 (4th Cir. 2001);[3] Doe v. Group Hospitalization & Medical Services, 3 F.3d 80, 82 (4th Cir. 1993).

In this case, plaintiff has satisfactorily shown a conflict of interest, inasmuch as the decision maker was both a fiduciary under the Plan and an employee of the carrier who ultimately would have been required to pay, had a decision favorable to plaintiff been rendered. Thus, the undersigned will apply a modified abuse-of-discretion standard, and determine, through close scrutiny, whether the Plan Administrator abused his discretion in rendering his decision.

## IV. Review of the Administrative Decision

The undersigned has closely reviewed not only the decision of the Plan Administrator, but the evidence of record which purports to support such decision. Such review has focused on whether there was an abuse of discretion by the fiduciary in the decision-making process, by and through a review of the eight factors provided in Booth, supra.

### A. The Language of the Plan

In conducting such review, the undersigned has reviewed the language of the Plan. In relevant part, the Plan provides LTD benefits for the first 24 months following a 120 day

---

[3]     Due to the limits of electronic filing, a copy of such opinion is incorporated herein by reference to the Westlaw citation.

"qualifying period," as follows:

> You will be considered Disabled if, solely because of Injury or Sickness, you
> are either:
> ■ Unable to perform all the material duties of your Regular Occupation or a
>   Qualified Alternative; or
> ■ Unable to earn 80% or more of your Indexed Base Monthly Salary.

Plaintiff's Brief, Ex. A, at 11. Under the Plan, a person is not disabled if they can perform:

(1) their regular job; (2) another job at Honeywell that pays at least 80 percent of the

employee's regular job; or (3) a job in the local economy that pays 80 percent of their job

with Honeywell.

### B.    The Purpose and Goals of the Plan

Review of the Plan reveals that it is an employee funded, after tax employee welfare

benefit Plan. The stated goal of the Plan is to

> protect you if you become Disabled and cannot work for an extended period.
> The Plan is designed to replace a portion of your income when you need it
> most.

Id., at ii. The amount that comes out of an active employee's paycheck is the "level of

contribution," which is "determined based on claims expected to be paid in view of past

claims experience and demographics of the employee population." Id., at 16.

### C.    The Adequacy of the Materials

In this case, the thrust of plaintiff's argument is that the materials relied upon by the

independent consultant and the Plan Administrator were inadequate in reaching their

conclusions. The duty of this court is to determine the adequacy of the materials *considered*

*by the Plan Administrator* in making his decision and the degree to which they support that

decision. In making such determination, the undersigned has closely reviewed not only the

materials that were before the Plan Administrator, but also the materials that were relied on

by Dr. Richard A. Silver, inasmuch as plaintiff has asserted that his decision was not only

biased,[4] but uninformed.

On June 15, 2004, defendant referred plaintiff's claim to Network Medical Review Company for consideration.  A.R., at 836.  In the "IME/PFR Referral," defendant requested review by a specialist in orthopedic surgery.  Such referral reflected plaintiff's age (then 48), her job title and the exertional level for that job, her medical diagnosis, and the definition of disability provided by the Plan.  In addition to seeking opinion as to plaintiff's restrictions and limitations, as well as functionality, defendant stated:

> Metlife's focus is on defining our claimant's level of functionality and abilities.  Please define the claimant's current level of functionality based on your review of all material provided, medical documentation and/or physical examination according to DOT [Dictionary of Occupational Titles] physical demands.

A.R., at 837.  Dr. Richard A. Silver states on the first page of his report that 195 pages of records were provided for his review, A.R., at 840, and he states that he has conducted a thorough review of those records.  A.R., at 841.  Close review of such four page, single spaced opinion reveals that Dr. Richard A. Silver closely reviewed plaintiff's medical records and fairly summarized the notes of plaintiff's own doctors.  The undersigned can find  no merit to plaintiff's argument that Dr. Richard A. Silver's opinion was uninformed.

In addition to the materials that were before the consulting physician, the undersigned has also reviewed the entire administrative record to determine whether it provided a decision maker with an adequate basis for decision.  The record is extensive, it includes all the materials submitted by plaintiff in support of her claim, and provided the Plan Administrator with  an adequate basis for decision.

D.    **Whether the Fiduciary's Interpretation was Consistent with Other Provisions in the Plan and with Earlier Interpretations of the Plan**

---

[4]     The undersigned incorporates herein the earlier discussion in the context of the Motion to Compel, and reiterates that bias of a consultant is not a proper issue.

There appear to be no issues of interpretation as the language of this particular Plan and plaintiff has not pointed the court to any prior inconsistent interpretations of the Honeywell Plan document.

###### E.      Whether the Decision-Making Process was Reasoned and Principled

Plaintiff points to a request for clarification sent by defendant to Dr. Richard A. Silver. In response to formal question number one posed by the Plan Administrator, Dr. Richard A. Silver opined that plaintiff would be capable of "working without any limitations on 6/01/03 following all of the special studies, etc." Prior to issuing his decision, the Plan Administrator asked such doctor to

> elaborate on Question #1 pertaining to claimant's functionality. The NMR report indicated that the claimant was cleared to return to work on 6/01/03. LTD effective date is 4/3/03. Therefore, we need to know what claimant's functionality was from 4/3/03 and beyond. Dr. [Richard A.] Silver indicated that Ms. Shepherd has a mild impairment and could return to work on 6/1/03. Please provide what changed in her condition or what reasoning was used for the 6/1/03 date.

A.R., at 834. In response, Dr. Richard A. Silver responded that "Ms. Shepherd was capable of graduated return to work from 4/4/03 until 6/1/03, at the sedentary level. She was capable of moving forward to full duty as of 6/1/03. Id. In addition to conducting a review of the medical records, Dr. Richard A. Silver completed an "Estimation of Physical Capacities," which was based on such doctor's "file review of the clinical evaluation, objective medical evidence and diagnostic test results." A.R., at 846.

A request for clarification does not point to a finding that a Plan Administrator's decision was not reasoned or principled. Clearly, the Plan Administrator sought clarification of a segment of an expert opinion that was not clear, which is both a reasoned and principled method of decision making. Instead, it shows that the Plan Administrator carefully reviewed the opinion of the consulting specialist and when he found a portion of the opinion that was

unclear, he sought clarification.

Turning next to the substance of the Plan Administrator's decision, the Plan Administrator issued his decision on July 15, 2004, by way of a six page determination letter addressed to plaintiff's counsel. Such decision sets forth the correct disability standard drawn from the applicable Plan, describes plaintiff's job at Honeywell and the physical demands of that job, and then discusses plaintiff's medical history. The Plan Administrator reviewed the findings of Dr. Hopkins in 2003 (as discussed above), then noted that he employed Dr. Richard A. Silver to assist in the review in 2004. A.R., at 829. The Plan Administrator then reviewed and discussed such consultant's findings and conclusions concerning plaintiff's medical history. After conducting such review, the Plan Administrator discussed the extent of plaintiff's loss of functionality, the consultant's conclusion that plaintiff had a mild impairment, plaintiff's own doctors conclusion that the surgery was successful, and the postoperative battery of tests. A.R., at 831. The Plan Administrator also review the findings of Dr. Dennis Martin, who conducted tests as to plaintiff's bilateral carpal tunnel syndrome. Id. The Plan Administrator also considered the results of Dr. Martin's electro physiological study, in which Dr. Martin concluded that her carpal tunnel syndrome was normal on her right side and that on the left she suffered from mild to moderate slowing in the left median nerve at the carpal tunnel. Id. After reviewing all of the medical evidence, the Plan Administrator concluded that

> the information in Ms. Shepherd's file is insufficient to support a condition of such severity as to preclude her ability to perform the essential functions of her occupation per the Plan. Therefore, the original claim determination was appropriate.

Id.

Having reviewed the Plan Administrator's final decision, the undersigned finds that his decision was both reasoned and principled. The Plan Administrator properly relied on

the opinions of expert consultants, and those opinions in turn were based on a fair and objective review of the medical evidence of record. Clearly, the findings of plaintiff's own physicians support the Plan Administrator's ultimate conclusion.

### F. Procedural and Substantive Requirements of ERISA

The next issue is whether the Plan Administrator's decision is consistent with the procedural and substantive requirements of ERISA. Other than determining which Plan applied, plaintiff has made no challenge to the decision based on procedural or substantive compliance with ERISA. The undersigned finds that the decision of the Plan Administrator is in substantial compliance with ERISA.

### G. External Standards

The undersigned has been cited to no external standard that would be applicable to this particular case. Instead, in reviewing the decision, the undersigned has found that the decision of the Plan Administrator complies with standards applicable to Social Security disability determinations in that the decision is not inconsistent with the findings of plaintiff's treating physicians. Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

> Objective medical facts and the opinions and diagnoses of the treating and examining doctors constitute a major part of the proof to be considered in a disability case and may not be discounted by the ALJ.

Id., at 187. Further, the undersigned finds that the Plan Administrator adequately fulfilled his obligation of explaining his decision.    In Hatcher v. Secretary, 898 F.2d 21, 23 (4th Cir. 1989), the Court of Appeals for the Fourth Circuit held that

> "[t]his duty of explanation is always an important aspect of the administrative charge, . . . and it is especially crucial in evaluating pain, in part because the judgment is often a difficult one, and in part because the ALJ is somewhat constricted in choosing a decisional process."

Id., (quoting Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985) (citations omitted)). While the undersigned would have preferred that the Plan Administrator also consider the activities

of plaintiff's daily life in determining whether her pain prevented her performing her normal work, that particular "external standard" has not yet migrated to ERISA from Social Security law.

### H.   Fiduciary Motives and Conflicts of Interest

The undersigned has carefully reviewed the decision of the Plan Administrator to determine whether he fulfilled his fiduciary duty to the Plan, its participants, and beneficiaries such as plaintiff.  While a conflict of interest does exist, it does not appear to the undersigned that the Plan Administrator at any time abandoned his fiduciary duty in favor of his employer.  The Plan Administrator carefully reviewed all the medical evidence of record, considered the physical demands of plaintiff's job, and gave due consideration to the opinion of the expert he had employed to conduct a file review.  While the undersigned notes plaintiff's argument that the firm which provided such expert opinion may market itself to the insurance industry and further argument that such firm may be biased toward findings negative to the claimant, review of the opinion of Dr. Richard A. Silver indicates that it was based on a thorough review of the medical evidence of record, that it was reasoned, and that it was well within his fields of expertise.

As discussed above, the purported bias of an expert is not relevant; rather, it is the bias of a Plan Administrator that is important. Abromitis, supra.  Even had the standard been *de novo*, the undersigned would have been hard pressed to reach a different conclusion in this matter inasmuch as plaintiff's claim for benefits finds little, if any, support in the medical evidence which she supplied.  Indeed, a reasonable inference that can be drawn from the notes of plaintiff's own treating physicians is that she had a most successful outcome, that she retains the functional capacity to do her job, and that she is overstating the vocational impact of her pain.

## V.    Conclusion

The undersigned has assessed whether the decision maker considered all of plaintiff's impairments, whether the decision maker's interpretation of the "objective medical proof" provided by plaintiff in accordance with the Plan was within the realm of reason, whether the decision maker properly considered the opinion of the consulting physicians, and whether the decision maker wholly disregarded the judgment of plaintiff's treating physicians.

In doing so, the court has reviewed closely the administrative record. Without doubt, the decision of the Plan Administrator was the product of a reasoned and principled decision making process based upon adequate materials and inquiry, and was consistent with the purposes and goals of the Plan. The question for the court is whether the administrators and fiduciaries abused their discretion in the context of a sliding-scale review, which comes down to whether plaintiff received a full and fair review. 29 U.S.C. § 1133(2)(a claimant must be allowed "a full and fair review by the appropriate named fiduciary of the decision denying the claim."); Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F. 2d 154 (4th Cir. 1993)(failure to provide "full and fair review" amounts to abuse of fiduciary discretion).

Review of the record reveals that plaintiff failed to submit any evidence concerning her residual functional capacity to the Plan Administrator. When plaintiff asked her own neurosurgeon, Dr. Jon Silver, to give an opinion as to her functional capacity, he declined. Instead, he recommended that the plaintiff obtain a functional capacity evaluation (FCE). Dr. Burke ordered an FCE for plaintiff, and Dr. Burke remarked that such report "showed that [Plaintiff] was performing at submaximal effort." A.R., at 814. Plaintiff failed to tender this FCE to the Plan Administrator in support of her claim.

Dr. Burke, who was in practice with Dr. Jon Silver, and was another of plaintiff's treating physicians was sent a questionnaire by plaintiff's counsel and opined that plaintiff

could sit 6 hours in an 8 hour day, stand up to 3 hours in an 8 hour day, and walk up to 4 hours in an 8 hour day. As with Dr. Richard A. Silver's "Estimation of Physical capacities," A.R., at 846, such limitations are not inconsistent with the physical demands of plaintiff's job as a small parts assembler, classified as "light work." When Dr. Burke was asked by plaintiff's counsel to give an opinion as to whether the plaintiff met the definition of disability provided in Plan One, Dr. Burke replied that she "cannot say." A.R., at 603. Thus, plaintiff's claim finds no support even in the opinions of her own treating doctors.

Plaintiff's claim also finds no support in the clinical notes of Dr. Jon Silver and Dr. Margaret Burke. From the surgical side, Dr. Jon Silver notes what appears to be a completely successful fusion with no nerve impingement and no swelling. While Dr. Jon Silver appears to have provided a closed end "doctors note" allowing plaintiff to go out on disability for the three months following surgery, at the next appointment on January 8, 2003 (which was specifically set for making recommendations regarding plaintiff's work status as well as follow up), Dr. Jon Silver noted the following:

> The patient had been improving and now is having significantly worse neck and arm pain. **I am not sure what to make of this**. Her grafts appear to be incorporating well. There is no evidence of pseudoarthrosis.

A.R., at 667 (emphasis added). A reasonable inference which a Plan Administrator could draw from this note is that plaintiff was malingering, especially when such note is considered with Dr. Burke's notes concerning the failure of trigger-point injections to give plaintiff relief and her failure to exert maximal effort in the functional capacity study. In light of all this evidence, it was most appropriate for the Plan Administrator to seek the opinion of an expert in the relevant field who could also provide vocational guidance. In his final decision, the Plan Administrator noted, as follows:

> On July 14, 2003 Ms. Shepherd's file was evaluated by an Independent Physician Consultant, Board Certified in Internal and Occupational Medicine.

The consultant noted that no physical impairment was objectively documented, which would have precluded Ms. Shepherd from returning to work full-time at her own occupation as of April 3, 2003. The consultant noted that Dr. Jon Silver recommended a Functional Capacity Evaluation (FCE) to determine what work restrictions she would need, if any. However, this evaluation was not available for review.

* * *

The consultant concluded that based on the medical records, from an orthopedic perspective, Ms. Shepherd had a mild impairment.

* * *

Based on our review, the information in Ms. Shepherd's file is insufficient to support a condition of such severity as to preclude her ability to perform the essential functions of her occupation per the Plan.

A.R., at 828-31.

Plaintiff asks this court to discount the opinions of the two physicians defendant employed to review plaintiff's claim, arguing in the context of the standard of review that the Plan Administrator improperly relied on biased expert opinion. She characterizes such doctors as "hired guns," which they may well be; however, the issue is not so much who hired them, but whether their aim was true. Dr. Richard A. Silver provided an extensive review of the medical records of plaintiff's various treating physicians. His consulting opinion concludes that plaintiff retained the ability to perform the essential functions of her job at Honeywell. Despite plaintiff's arguments to the contrary, Dr. Richard A. Silver's consulting opinion is not inconsistent with the medical evidence of record. His opinion fairly and accurately reflects the findings of Dr. Jon Silver and Dr. Margaret Burke. While plaintiff argues that it is unreasonable for a Plan Administrator to rely on the functional capacity evaluation[5] of a physician who never actually saw the claimant, it appears that all of the findings of the consulting physician have their factual predicate in the medical findings of plaintiff's own physicians. That is the very nature of a medical file review, and at no point

_____

[5] While plaintiff apparently had her own FCE administered, she failed to submit that evaluation to the Plan Administrator.

does such opinion feign to be a finding resulting from an independent medical examination. The decision of the Plan Administrator is supported by substantial evidence contained in the Administrative Record. The undersigned has applied the lessened standard required and has reviewed each and every page of the extensive administrative record looking for evidence that would support the plaintiff's claim of disability or bolster her argument that the Plan Administrator acted with bias toward her. None is found.

The undersigned will, therefore, recommend that plaintiff's Motion for Summary Judgment and Motion to Compel be denied and that defendant's Motion for Summary Judgment be affirmed, and that the decision of the Plan Administrator be affirmed.

* * *

Finally, the court appreciates the fine manner in which respective counsel have managed this case and thoroughly briefed the issues. The court would, however, appreciate it in the future if the parties would submit a joint Administrative Record that is bound, indexed, and tabbed.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that plaintiff's Motion for Summary Judgment and Motion to Compel be **DENIED**, that defendant's Motion for Summary Judgment be **GRANTED**, and that the final decision of the Plan Administrator be **AFFIRMED**.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same.

Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984).

**Signed: August 16, 2005**


Dennis L. Howell
United States Magistrate Judge