**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL NO. 1:04CV136**

| | | |
|---|---|---|
| **EARNESTINE SHEPHERD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **METROPOLITAN LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Plaintiff's timely filed objections and the Defendant's response to the Memorandum and Recommendation of U.S. Magistrate Judge Dennis L. Howell, recommending Plaintiff's motions to compel and for summary judgment be denied and Defendant's motion for summary judgment be allowed. For the reasons stated below, the Memorandum and Recommendation is adopted by the Court.

# I. STATEMENT OF FACTS

The Plaintiff was employed as a small basic switch adjuster by Honeywell International, Inc. ("Honeywell"). Plaintiff's job consisted of assembling a "limited number of parts" and performing "several internal and external operations to adjust travel and force characteristics" of switches and components. **Administrative Record ("AR"), at 88, 108, 528.** Honeywell described the physical requirements of the small switch adjustor position to be seven to eight hours of sitting; one to two hours of standing, walking, and/or twisting; seven to eight hours in repetitive use of the hands, with simple grasping and fine finger dexterity; three to four hours a day using the head in a twisting or looking down position; and occasional (*i.e.*, less than 33 percent of the time) lifting of up to ten pounds. ***Id.*, at 90, 110.** Plaintiff has a high school education and all recent work experience has been in assembly positions. ***Id.*, at 42-48.**

Honeywell was at all relevant times the administrator of the Honeywell Long-Term Disability (LTD) Income Plan (the "LTD Plan"). **Exhibit A, January 1, 2002 LTD Summary Plan Description, *attached to* Plaintiff's Memorandum in Support of Motion for Summary**

**Judgement, filed March 30, 2005, at 15.**  In the LTD Plan, Honeywell

reserved the right to

> allocate or delegate its responsibilities for the administration of
> the Plan to others and employ others to carry out or render
> advice with respect to its responsibilities under the Plan,
> including discretionary authority to interpret and construe the
> terms and provisions of the Plan, to direct disbursements, and
> to determine eligibility for Plan benefits.

*Id*.  Honeywell initially delegated responsibility for claims administration to

CIGNA and later replaced CIGNA with Defendant MetLife.  *Id.*; **Complaint,**

**¶¶ 2, 5; Defendant's Answer, Eighth Defense, filed September 13,**

**2004, ¶¶ 2, 4.**

Plaintiff's back problems began around August 1988 after an

automobile accident.  She underwent a lumbar diskectomy on January 26,

1989, which seemed to be successful and provided pain relief.  However,

at some point in 1992, Plaintiff "apparently sneezed and thereupon began

to have recurrent symptoms of pain into her back[.]"  Plaintiff underwent a

microlumbar diskectomy for a recurrent disk fragment on October 1, 1993.

***Id.*, at 206-08, 216-17, 406.**  A review of her medical records, reveals she

appeared to have done fairly well from 1993 through 2000.  In 2000, she

received an epidural steroid injection and began physical therapy for

recurrent back pain.  ***Id.*, at 360.**  In December of 2001, Plaintiff had

continuous epidural cervical therapeutic blocks, achieving satisfactory results. *Id., at 492.*

Plaintiff began seeing Dr. Margaret Burke, a physician practicing physical medicine and rehabilitation with a specialty in spinal cord injury, in October 2001 on referral from Dr. Marianna Daly, Plaintiff's primary care physician. *Id., at 604, 634.* Dr. Burke continued treating Plaintiff largely with medications through the end of 2001 and throughout much of 2002. *Id., at 638-53.* Dr. Burke's notes of the May 2, 2002, consultation show that

> Since her last visit [on March 21], she has completed her rheumatological workup. All of her x-rays were negative. We reviewed them today. She does have degenerative disc disease at L5-S1, but no other signs of inflammatory arthritis. Her labs were normal.
>
>         \*            \*            \*
>
> She is currently working full-time, but will have to leave early on occasion.
>
>         \*            \*            \*
>
> She doesn't request any additional prescriptions and is scheduled to return to clinic in 3 months.

*Id., at 646.* When she returned for her next appointment on August 9, 2002, Dr. Burke noted that during the time between these two visits "she did quite well until recently," but was now complaining of escalating neck pain and pain in the lower back. *Id., at 650.* Dr. Burke sent Plaintiff for an

"MRI of the cervical spine to assess any worsening of the C5-6 disk protrusion;" the results of the MRI showed "a large disc protrusion in the central to left paracentral region with accompanying osteophytes" at the C5-6. *Id.*, **at 650-51.** The protrusion resulted in "considerable cord impingement and deformity . . . [predominantly] in the left paracentral region." *Id.*, **at 651.** The MRI also revealed a disc protrusion and accompanying cord impingement at the C6-7, "although not to the same extent as at C5-6." *Id.*, **at 652.** "The remaining visualized intervertebral discs appear[ed] unremarkable." *Id.*

Following the August 22 MRI, Plaintiff was referred by Dr. Burke to Dr. Jon Silver, a neurosurgeon in the same practice as Dr. Burke. *Id.*, **at 654.** At his initial consultation with Plaintiff on September 5, 2002, Dr. Silver scheduled her for an anterior cervical diskectomy and fusion at C5-6 and C6-7. *Id.*, **at 656.** The surgery was performed by Dr. Silver on October 3, 2002, without complication. *Id.*, **at 658-61.** Plaintiff began receiving short term disability benefits from Defendant on this date as well. *Id.*, **at 1-8.**

Plaintiff was seen again by Dr. Jon Silver on October 29, 2002, for a "post-op re-check." Dr. Silver noted that she was "doing well with

improvement of her pain but still not resolution.  It may take some time and certainly radiographically everything looks good.”  ***Id., at 94-95, 664.***  X-rays performed during this check-up showed that the “[a]nterior plate and bone grafts are seen in good position,” and no abnormality was identified.  ***Id., at 663.***

Plaintiff began physical therapy in November 2002 at Mission Hospital.  ***Id., at 145.***  She did not progress as well as was expected and her physical therapy was terminated in January 2003 after Plaintiff began reporting “[increased] pain as bad as before surgery.”  ***Id., at 143.***  However, a January 11, 2003, MRI of the cervical spine performed with and without contrast was, “[a]llowing for the metal artifact from the screws present at C5-6-7, unremarkable[.]”  ***Id., at 175-76, 268-69.***  An x-ray report from the same period produced the same results, showing “[n]o acute abnormalities,” that the “[a]nterior plate and bone grafts [are] in good position,” and that the “[g]rafts appear to be incorporating well.”  ***Id., at 668.***  In completing a MetLife “Attending Physician Supplemental Statement” form in January 2003, Dr. Jon Silver noted that the Plaintiff “had been improving and now is having significantly worse neck and arm pain.  I am not sure what to make of this.  Her grafts appear to be

incorporating well.  There is no evidence of pseudoarthrosis."  ***Id.*, at 31-33,  667.**

In February 2003 Plaintiff, still receiving her short term disability benefits under the Plan, began the process necessary to obtain long term disability benefits.  On February 14, Defendant responded to Plaintiff's request, providing her with the forms to be completed by her and her physicians, as well as informing her that MetLife would need, among other things, "[o]bjective test report's [sic] from your Treating Physician."  ***Id.*, at 34.**  Plaintiff completed the paperwork, indicating that "pain in [her] left arm and neck" prevented her from performing the duties of her job.  ***Id.*, at 49-50.**  Dr. Silver completed a "Neck Disorder Initial Functional Assessment" form provided by MetLife.  When asked to provide "objective findings to support the patient's inability to perform [her] job duties," Dr. Silver replied with subjective information of Plaintiff's "complaints of persistent arm pain."  ***Id.*, at 56-58, 675-76.**  Dr. Silver also noted that Plaintiff's functional capabilities were "to be determined," and she would need a "FCE," or functional capacity evaluation.  ***Id.*, at 56-58,  675-76.**

In March 2003, Plaintiff was again evaluated by Dr. Silver.  This post-op recheck showed that Plaintiff was "doing about the same" and that "[h]er

MRI did not really reveal anything obvious." *Id.*, **at 672.** Dr. Silver

recommended trying cervical epidural steroid injections. The injection was

performed on March 27, 2003, without complication. *Id.*, **at 184-85, 673-**

**74.**

On May 13, 2003, Defendant denied Plaintiff's claim for long term

disability benefits. *Id.*, **at 59-60.** Approximately two weeks later, on May

29, 2003, Plaintiff had an MRI of the lumbar spine with and without contrast

as a result of reported "right leg weakness." The results of this procedure

showed "no evidence of a recurrent disc protrusion at L4-5 or L5-S1," and

"no canal stenosis." The MRI did show "mild to moderate foraminal

narrowing bilaterally at L5-S1, worse on the left . . . [which was] secondary

to degenerative osteophytes encroaching on the neural foramina." *Id.*, **at**

**186-87, 291-92.**

Plaintiff appealed the denial of her benefits claim on June 2, 2003.

*Id.*, **at 61-63, 69.** In considering her appeal, Defendant referred Plaintiff's

file to Dr. Amy Hopkins, a physician board certified in internal medicine and

occupational medicine. *Id.*, **at 72, 564.** In summary, Dr. Hopkins

concluded that "[t]here was no actual objective evidence in this record of

any functional impairment which would have prevented [Plaintiff] from

performing the material duties of her own occupation as of 4/3/03." ***Id.*, at 72.** After considering Dr. Hopkins' opinion and the other materials in her file, Defendant denied Plaintiff's appeal on July 15, 2003. ***Id.*, at 70-71.** Following this denial, Plaintiff enlisted the services of her current attorney. ***Id.*, at 75-76.**

Plaintiff saw Dr. Jon Silver again on June 23, 2003, following receipt of an epidural steroid injection. According to Plaintiff, the injection was not helpful. Still without explanation as to the cause of Plaintiff's reported pain, Dr. Silver sent Plaintiff for a cervical myelogram/CT and C-spine flexion/extension films.[1] Dr. Silver stated that he would make further recommendations after receiving the results of these tests and would send Plaintiff back to Dr. Burke if there was nothing found requiring surgical intervention. ***Id.*, at 677.**

Plaintiff underwent the tests ordered by Dr. Silver on July 9, 2003. ***Id.*, at 188-91, 196-99, 301-04.** In interpreting the results, Dr. Silver noted that the test "confirms what we saw on MRI. There appears to be good decompression of the C5-6 and C6-7 levels. Grafts are in good position

---

[1] Dr. Silver also recommended the Plaintiff have a functional capacity evaluation. **AR, at 677.** The results of such evaluation, if completed, do not appear in the record.

and appear to be fully incorporated. There is some mild narrowing at C4-5. . . . There is no significant nerve root compression and no tight canal stenosis." *Id.*, **at 678, 825.** Dr. Silver did not believe any further surgical intervention was warranted and referred Plaintiff back to Dr. Burke for rehabilitation treatment. *Id.*, **at 678, 825.** On July 17, 2003, Dr. Silver noted that Plaintiff's ending date of disability was "to be determined," and that "[f]urther recommendations regarding work status [would] be made at next [appointment]." *Id.*, **at 683.**

On July 29, 2003, Dr. Byron Dickerson wrote to Dr. Marianna Daly, Plaintiff's primary physician, regarding the results of an epidural steroid injection performed on Plaintiff. Dr. Dickerson noted that Plaintiff reported an improvement in her symptoms, including that while Plaintiff's pre-injection pain level was self-reported at 3 to 4 on a scale of 10, her reported post-injection pain level was 0 out of 10. *Id.*, **at 710-11.**

Plaintiff returned to Dr. Burke on August 19, 2003, her first visit with Dr. Burke in approximately one year. Dr. Burke noted that:

> I think the patient would be an excellent candidate for trigger point injections into the trapezius. I will plan this in the near future. If she has excellent relief with short duration, she might be a candidate for BOTOX in the associated muscles for more prolonged relaxation and relief. This would allow her to improve her posture and decrease her residual pain. She also

would be a good candidate for specific physical therapy and
this will be set up as well.  She had a functional capacity
evaluation on July 25, and this showed that she was performing
at submaximal effort, therefore, I really feel that she will need
further intervention before she can be at maximum medical
improvement.

***Id.*, at 814.**[2]  Plaintiff again met with Dr. Burke on August 29, 2003.  Dr.

Burke's notes show that while Plaintiff complained of pain, "she does admit

that the pain was abolished by her recent lumbar epidural steroid injection."

***Id.*, at 812.**  Plaintiff received a trigger point injection on this date as well,

which she reported at her October 28, 2003, appointment with Dr. Burke

gave her some level of relief, although the exact amount of neither the pain

nor the relief was reported.  ***Id.*, at 811-12.**

In November 2003, Plaintiff's attorney asked Dr. Burke to complete a

"Disability Questionnaire" to be provided to MetLife.  ***Id.*, at 598-603A.**  Dr.

Burke completed the questionnaire in December and stated her opinion

that Plaintiff could not perform the material duties of her regular occupation

because she "cannot tolerate repetitive motion and prolonged sitting

sufficiently to meet production."  ***Id.*, at 602.**  Dr. Burke also noted that in

---

[2] The results of the July 25 FCE mentioned by Dr. Burke are not a
part of the Administrative Record.

her "clinical judgment," Plaintiff could sit for six hours in an 8-hour workday

and  stand for three hours in an 8-hour workday.  *Id.*, at 603A.

In January 2004, after receiving Dr. Burke's completed questionnaire,

Plaintiff's attorney requested that Defendant reconsider Plaintiff's appeal,

including the additional medical records provided with the request.  *Id.*, at

**625-28.**  On appeal, Defendant referred Plaintiff's file to consultant Dr.

Richard Silver for review.  Dr. Silver issued his assessment and opinion of

Plaintiff's claim on July 1, 2004.  After remarking on the relevant medical

records, Dr. Silver concluded:

> Based on the medical records, from an orthopedic perspective, Ms. Shepherd has a mild impairment.  This is based on Ms. Shepherd's most recent cervical surgery, and the medical records from all of the various attending physicians and consultants, the MRI pre and postoperatively, and the myelogram and myalographically enhanced CT scan pre and postoperatively.
>
> Ms. Shepherd is capable of working in a light duty without any restrictions, modifications, or limitations.  It may be appropriate to consider frequent position changes every 30-45 minutes at minimum and one and a half to two hours maximum for sitting, standing, and walking.  She could lift up to 35 pounds maximum on an infrequent basis and lift up to 15-20 pounds on a frequent basis.
>
> *          *          *
>
> Ms. Shepherd is capable of being gainfully employed and returning to [her] own . . . normal occupation 06-01-03 to the present time.

*Id.*, **at 839-47.**  Plaintiff's short term disability benefits period ended and her LTD benefits eligibility period began on April 3, 2003.  Because Dr. Richard Silver's opinion did not specifically address the period from April 3 through June 1, Defendant asked Dr. Silver to clarify Plaintiff's functionality for that period.  *Id.*, **at 834.**  Dr. Silver issued an addendum to his report on July 14, 2004, clarifying that in his opinion "Ms. Shepherd was capable of a graduated return to work from 4/4/03 until 6/1/03, at the sedentary level. She was capable of moving forward to full-duty as of 6/1/03."  *Id.*

On July 15, 2004, Defendant informed the Plaintiff that the appeal of her claim for LTD benefits was rejected.  *Id.*, **at 827-32.**  In summary, Defendant concluded that "[b]ased on our review, the information in Ms. Shepherd's file is insufficient to support a condition of such severity as to preclude her ability to perform the essential functions of her occupation per the Plan.  Therefore, the original claim determination was appropriate."  *Id.*, **at 831.**

Plaintiff filed her complaint on July 20, 2004, asserting a cause of action under 29 U.S.C. § 1132(a)(1)(B) to recover disability benefits due under the Employee Retirement Income Security Act ("ERISA") plan, and for statutory penalties under 29 U.S.C. § 1132(c)(1)(B) for failure to

disclose information. **Complaint, ¶¶ 18-32.** The cross-motions for summary judgment and the Memorandum and Recommendation pertain only to Plaintiff's claim for benefits under § 1132(a)(1)(B). *See,* **Plaintiff's Motion for Summary Judgment, filed March 30, 2005; Defendant's Motion for Summary Judgment, filed May 2, 2005; Memorandum and Recommendation, filed August 17, 2005.**

## II. STANDARD

### A. Objections to Memorandum & Recommendation

A party may file written objections to a magistrate judge's memorandum and recommendation within ten days after being served with a copy thereof. **28 U.S.C. § 636(b)(1).** "Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections." ***Thomas v. Westinghouse Savannah River Co.,* 21 F.Supp.2d 551, 560 (D.S.C. 1997);** *see also,* **Battle v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987) ("Parties filing objections must specifically identify those findings objected to.").** "Frivolous, conclusive or general

objections need not be considered by the district court."[3]  **Battle, 834 F.2d**

**at 421 (footnote added).**

> A general objection, or one that merely restates the arguments
> previously presented is not sufficient to alert the court to
> alleged errors on the part of the magistrate judge.  An
> "objection" that does nothing more than state a disagreement
> with a magistrate's suggested resolution, or simply summarizes
> what has been presented before, is not an "objection" as that
> term is used in this context.
>
> \*          \*          \*
>
> A general objection to the magistrate's report has the same
> effect as a failure to object.  The district court's attention is not
> focused on any specific issues for review, thereby making the
> initial reference to the magistrate useless.  The functions of the
> district court are effectively duplicated as both the magistrate
> and the district court perform identical tasks.  The duplication of
> time and effort wastes judicial resources rather than saving
> them, and runs contrary to the purposes of the Magistrates Act.

*Aldrich v. Bock*, 327 F.Supp.2d 743, 747-48 (E.D. Mich. 2004); *see also,*

*Betancourt v. Ace Ins. Co. of Puerto Rico,* 313 F.Supp.2d 32, 34

**(D.P.R. 2004) ("[Plaintiff's] objections do not reflect an understanding**

**that a plaintiff may not simply restate the arguments that the**

**Magistrate-Judge considered and expect the Court to treat the filing**

**seriously.").**

---

[3] For this reason, the Court declines Plaintiff's "request that the United States District Court judge review the parties' motions, briefs, and record documents, and determine all issues."  **Plaintiff's Objections, at 2.**

If proper objections are made, a district court will review the objections under a *de novo* standard. **28 U.S.C. § 636(b)(1).** Where no objection is made, the court need "'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" ***Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005),** *cert. denied*, **126 S. Ct. 1033 (2006) (quoting Fed. R. Civ. P. 72, Advisory Committee Note).**

## B. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Fed. R. Civ. P. 56(c).** "Summary judgment is proper 'unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" ***Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir.),** *cert. denied*, **126 S. Ct. 568 (2005) (quoting *Anderson v. Liberty***

***Lobby, Inc.*, 477 U.S. 242, 249 (1986)).** A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleading[s], but [must] . . ., by affidavits or as otherwise provided in [Rule 56], . . . set forth specific facts showing that there is a genuine issue for trial." **Fed. R. Civ. P. 56(e).**

## III. ANALYSIS

Plaintiff's four main objections to the Memorandum and Recommendation are addressed *in seratim*.

## 1. Objection #1 - Denial of Motion to Compel

Plaintiff first argues that the Magistrate Judge erred in denying her motion to compel information regarding, among other things, the number of cases in which certain named physicians had given an opinion as to disability. Plaintiff argues, *inter alia*, that if provided with this information, she may be able to show bias on the part of these physicians, which could be used to show bias of the Defendant. ***See*, Plaintiff's Objections, at 2-4.** When the Court refers non-dispositive pretrial matters, such as discovery issues, to a magistrate judge for resolution, the Court will reverse

the magistrate judge's decision only if it is shown to be clearly erroneous or contrary to law; the Magistrate Judge's decision here was neither clearly erroneous nor contrary to law.  *See*, **28 U.S.C. § 636 (b)(1)(A);** *United States v. Leon-Sanchez*, **150 Fed. Appx. 186, 187 (4ᵗʰ Cir. 2005),** *cert. denied*, **126 S. Ct. 595 (2005)  (citing § 636 (b)(1)(A)).**

The basis for the denial of Plaintiff's motion to compel was soundly reasoned and clearly stated; therefore, the Court sees scant need to repeat the same here verbatim.  *See*, **Memorandum and Recommendation, at 6-8;** *Donnell v. Metropolitan Life Ins. Co.*, **2006 WL 297314, \*5 (4ᵗʰ Cir. 2006) (noting that "our precedent has established modification of the abuse of discretion standard of review as the method by which courts may take account of any conflict of interest that may have tainted the administrator's decision");** *Abromitis v. Cont'l Cas. Co./CNA Ins. Cos.*, **114 Fed. Appx. 57, 61 (4ᵗʰ Cir. 2004);** *Mobley v. Cont'l Cas. Co.,* **405 F.Supp.2d 42, 49 n.4 (D.D.C. 2005).**  The Court does note, however, that the discovery sought by Plaintiff is not that which the Court is inclined to allow in ERISA cases.  The ultimate result of traveling down such a path would be the transformation of

every individual ERISA case into the litigation of hundreds of cases,[4] as the

Court would be presented with case upon case in which a plaintiff's

physicians[5] or a defendant's consultants issued an opinion in favor of or

_____

[4] Plaintiff apparently believes that if a physician has issued a greater number of opinions finding "no disability" than "disability," such is evidence of bias. Her belief is false. The numbers alone tell the Court little to nothing about whether a particular physician is biased, regardless of how one-sided the numbers may be. Without the Court's digging into every case, examining the other opinions and medical evidence presented, there is simply no way to determine whether a particular physician's opinion in a particular case was or was not proper. And without knowing whether such opinion was proper, the numbers are irrelevant. For example, that a physician *properly* found 95 out of 100 persons "not disabled" does not make the physician biased, despite the connotation of a 95 percent "no disability" moniker. Without expanding every case exponentially, the Court simply has no way to judge the veracity or relevancy of the information sought by Plaintiff.

[5] Contrary to Plaintiff's apparent belief, the Court would have to take the same approach to a claimant's physicians as well, as a claimant's physician could suffer from bias in the same manner as could an administrator's consultant. ***See, e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"); *Mobley, supra* ("Plaintiff correctly submits that Dr. Blundon may have had an incentive to conclude that plaintiff was not totally disabled, because he was hired and paid by Continental. But the same can be said of Dr. Anderson: her capacity as plaintiff's treating physician supports an inference of bias in favor of plaintiff and may have influenced her conclusion that plaintiff is totally disabled. The Court takes into account that each physician may tend to favor the party with whom he or she is associated." (internal citations omitted)).**

against a finding of "disabled." The Court declines to embark on such a trip. Plaintiff's objection is, therefore, rejected. **_See, e.g., Abromitis, supra_ (wherein the court of appeals affirmed this Court denial of a motion to compel concerning substantially similar information to that sought by the Plaintiff in this case).**

## 2. Objection #2 - Governing Document and Delegation of Discretion

Plaintiff's second objection purports to cover two subjects, those being the determination that (a) "Plan One" is the document governing Plaintiff's claim, and (b) "Plan One" delegates discretion to MetLife. **Plaintiff's Objections, at 4.** Inasmuch as Plaintiff does nothing more than state her objection to the Magistrate Judge's finding that "Plan One" governs, this supposed "objection" is rejected. **_See, Battle, supra_; _Diamond, supra_; _Thomas, supra_; Plaintiff's Objections, at 4-5.**

Plaintiff also objects to the Magistrate Judge's determination that "abuse of discretion" review was the proper standard to employ. **Memorandum and Recommendation, at 14; Plaintiff's Objections, at 4-5.** Plaintiff does not dispute that the Plan unequivocally reserves discretionary authority to the Administrator, that this discretionary authority

extends to determinations of benefit eligibility, or that Honeywell explicitly reserved the right to "allocate or delegate its responsibilities for the administration of the Plan to others . . . including discretionary authority to . . . determine eligibility for Plan benefits." **LTD Plan, at 15.** Rather, Plaintiff argues that she should be afforded a *de novo* determination of her claim for LTD benefits because Honeywell initially delegated CIGNA the claims administration authority, but later replaced CIGNA with MetLife without utilizing a formal Plan amendment. **Plaintiff's Objections, at 4-5.** The Magistrate Judge rejected this argument, concluding that "Plaintiff's argument . . . is unavailing inasmuch as Honeywell reserved the right to modify the Plan "at any time." **Memorandum and Recommendation, at 14 (quoting LTD Plan, at 15).**[6]

---

[6] This Court likewise finds Plaintiff's argument unavailing. The change in claim administrators from CIGNA to MetLife was not an amendment, change, or modification in benefits under the Plan. Instead, it was a change in administrative bodies which was specifically and quite clearly provided for under the Plan and which had no effect on either the amount of benefits Plaintiff could receive or the terms upon which they could be received. *See, e.g., **Tourangeau v. Uniroyal, Inc.**, 189 F.R.D. 42, 46 (D.Conn. 1999) ("The real issue here is whether the act of increasing contribution rates was an amendment, modification or change in benefits to the ERISA plan. . . . Because the act of changing contribution rates was a valid exercise of an existing provision in the UGTC plan that authorized such changes, it did not constitute a plan amendment or modification." (citing **Krumme v. Westpoint Stevens***

In determining whether to use a *de novo* standard of review or the less rigorous "abuse of discretion" standard, the Court's focus is on whether the Plan grants discretionary authority to determine eligibility or construe the terms of the Plan. ***See, e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989); Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 124-25 (4th Cir. 1994).*** Where such discretion exists, an administrator's denial of benefits is reviewed under the deferential "abuse of discretion" standard. ***Stup v. UNUM Life Ins. Co. of Am., 390 F.3d 301, 307 (4th Cir. 2004).*** In this case, there is no question that such discretion exists and entitles Defendant to a review using the "abuse of discretion" standard[7] - *albeit* a modified "abuse of discretion" standard. ***See, Memorandum and Recommendation, at 8, 15-16.***

**3. Objection #3 - "Objective Medical Proof" and Definition of "Disability"**

_____

***Inc., 143 F.3d 71, 85 (2d Cir. 1998))).***

[7] The Court agrees with the Magistrate Judge's observation that even if this Court were to grant Plaintiff a *de novo* review, "the undersigned would have been hard pressed to reach a different conclusion in this matter inasmuch as plaintiff's claim for benefits finds little, if any, support in the medical evidence which she supplied." **Memorandum and Recommendation, at 22.**

Although initially stated broadly, Plaintiff's third objection particularly pertains only to "objective medical proof" and the definition of "disability." **See, Plaintiff's Objections, at 5-7.** More specifically, Plaintiff first asserts that "'Plan One' does not contain language requiring 'objective medical proof' of disability, and it is an abuse of discretion for a plan administrator to require objective proof of disabling conditions such as pain which cannot be tested in a laboratory." ***Id.*, at 6.** Secondly, without any reference at all to the Memorandum and Recommendation, the Plaintiff presents arguments concerning the presence or absence of a "Qualified Alternative."

The Court first notes that it is not, as Plaintiff suggests, an abuse of discretion for an administrator to require objective proof of disability merely because the Plan does not specifically use the phrase "objective evidence." **See, e.g., *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006); *Hensley v. IBM Corp.*, 123 Fed. Appx. 534, 539-40 (4th Cir. 2004) ("[T]he Fourth Circuit has held that denials of benefits are permissible where the claimant provides only subjective pain complaints and not objective evidence").**

Second, as Plaintiff correctly notes, the administrator should take into account a claimant's reports of pain when an underlying physical condition that could reasonably be expected to cause pain has been shown by medically acceptable objective evidence. **Plaintiff's Objections, at 6;** *Boyd v. Liberty Life***, 2005 U.S. Dist. LEXIS 3804 (W.D.N.C. 2005).** However, there is no evidence that Defendant *failed* to consider Plaintiff's self-reports of pain. In denying her appeal, Defendant stated that "the *information* in Ms. Shepherd's file is insufficient to support a condition of such severity as to preclude her ability to perform the essential functions of her occupation per the Plan." **AR, at 831 (emphasis added).** The "information" in Plaintiff's file consisted of both objective and subjective evidence. A reasonable view of *both* types of information could properly lead to the conclusion that Plaintiff did not suffer from a disability so severe as to preclude her from performing the material duties of her position. Plaintiff's objection is accordingly rejected.

Plaintiff's objection concerning the definition of "disability" is rejected because it is, in fact, no objection at all. Rather, Plaintiff states her belief in what can and cannot be considered by the Court. ***See,* Plaintiff's Objections, at 7-9.** The Magistrate Judge did not recommend granting

summary judgment in favor of Defendant on the basis of any "Qualified

Alternative," and in fact, the only time he referenced "Qualified Alternative"

at all was in quoting the definition of "disability" from the Plan.[8]  **See,**

**Memorandum and Recommendation, at 17.**  In failing to reference any

specific error in the Memorandum and Recommendation, Plaintiff's

purported objection amounts to no more than pure argument, is improper,

and is, therefore, rejected.  ***Battle, supra* ("*Frivolous*, conclusive or**

**general objections need not be considered by the district court."**

**(emphasis added)).**

---

[8] This is in contrast to Plaintiff's use of the term no less than 12 times
in her Objections.  ***See generally*, Plaintiff's Objections.**

## 4. Objection #4 - MetLife's Denial of Benefits

Finally, "Plaintiff objects to the Magistrate's finding that MetLife's denial of benefits was proper," and sets forth a variety of arguments supporting that contention.  **Plaintiff's Objections, at 9.**

Plaintiff first argues that "[t]he reports of NMR Dr. Richard Silver and Dr. Amy Hopkins were not based on complete information and therefore do not constitute substantial evidence."  ***Id.***  Plaintiff advanced this same argument before the Magistrate Judge and it was rejected.

> In this case, the thrust of plaintiff's argument is that the materials relied upon by the independent consultant and the Plan Administrator were inadequate in reaching their conclusions.  The duty of this court is to determine the adequacy of the materials *considered by the Plan Administrator* in making his decision and the degree to which they support that decision.
>
> *                    *                    *
>
> *In addition to the materials that were before the consulting physician, the undersigned has also reviewed the entire administrative record to determine whether it provided a decision maker with an adequate basis for decision.*  The record is extensive, it includes all the materials submitted by plaintiff in support of her claim, and provided the Plan Administrator with an adequate basis for decision.

**Memorandum and Recommendation, at 17-18 (emphasis added).**

> [T]he court has reviewed closely the administrative record. Without doubt, the decision of the Plan Administrator was the product of a reasoned and principled decision making process

based upon adequate materials and inquiry, and was consistent with the purposes and goals of the Plan.

***Id.*, at 23.**

Even had the standard been *de novo*, the undersigned would have been hard pressed to reach a different conclusion in this matter inasmuch as plaintiff's claim for benefits finds little, if any, support in the medical evidence which she supplied. Indeed, a reasonable inference that can be drawn from the notes of plaintiff's own treating physicians is that she had a most successful outcome, that she retains the functional capacity to do her job, and that she is overstating the vocational impact of her pain.

***Id.*, at 22.**

The decision of the Plan Administrator is supported by substantial evidence contained in the Administrative Record. The undersigned has applied the lessened standard required and has reviewed each and every page of the extensive administrative record looking for evidence that would support the plaintiff's claim of disability or bolster her argument that the Plan Administrator acted with bias toward her. None is found.

***Id.*, at 26.**

The Court finds no error in the Magistrate Judge's conclusion that

what is paramount is the adequacy of the materials available to and

considered by the plan administrator and the degree to which those

materials support the administrator's decision.[9]  ***See, e.g., Booth v. Wal-***

---

[9] Plaintiff relies on *Mitchell v. Fortis*, 2005 U.S. App. LEXIS 15693 (4th Cir., July 29, 2005) in making her argument.  However, the key to the

***Mart Stores, Inc. Assoc. Health & Welfare Plan***, 201 F.3d 335, 342-43

**(4th Cir. 2000).**  In addition, having reviewed the entire record[10] - making

this Court the *third* different body to have completely reviewed Plaintiff's

records - the Court agrees that "plaintiff's claim for benefits finds little, if

any, support in the medical evidence which she supplied," and that

"[w]ithout doubt, the decision of the Plan Administrator was the product of a

reasoned and principled decision making process based upon adequate

materials and inquiry, and was consistent with the purposes and goals of

the Plan." **Memorandum and Recommendation, at 22-23.**  Plaintiff's

objection is, therefore, rejected.

---

court's decision in *Mitchell*, and the reason the instant case is inapposite,
was identified by Plaintiff in her Objections: "'Thus, we find that [the
consultant's] opinion cannot **alone** provide enough reasonable support for
[the administrator's] decision, even according [the administrator] tempered
discretion.'" **Plaintiff's Objections, at 10 (quoting *Mitchell*, at \*29)
(emphasis added).**

[10] Plaintiff makes much of the fact that the Administrative Record in
this case is nearly 900 pages in length.  ***See, e.g.,* Plaintiff's Objections,
at 9-11.**  However, a very substantial number of pages are occupied by
repeated documents (with some documents appearing 3 or more times),
blank charts, medical records wholly unrelated to the instant matter,
communications between Plaintiff's counsel and Defendant, and other
materials that, quite frankly, provide nothing in the way of support for
Plaintiff's claim.  ***See generally*, AR.**

Plaintiff also argues the "Magistrate Judge erred in disregarding Plaintiff's evidence of the bias of MetLife's medical reviewers." **Plaintiff's Objections, at 12.** According to Plaintiff, this bias was shown by the fact that Dr. Amy Hopkins reviews a large number of cases for MetLife. **Id., at 11-12.**

Contrary to Plaintiff's assertion, and as is quite clear from the Memorandum and Recommendation, the Magistrate Judge did not "disregard[] Plaintiff's evidence of the bias of MetLife's medical reviewers." **Plaintiff's Objections, at 12; Memorandum and Recommendation, at 6-8.** Plaintiff's real objection is that the Magistrate Judge did not completely ignore the opinions of MetLife's medical reviewers. Not only was the Magistrate Judge not required to do so, but he took account of Plaintiff's arguments and evidence regarding possible bias in the proper manner - "by slid[ing] the scale [of review] to the degree warranted" by Plaintiff's bias argument. **Memorandum and Recommendation, at 8; *Abromitis*, *supra*; *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003); *Mobley, supra*.** Plaintiff's objection is rejected.

After a review of all of the information in Plaintiff's file, the Defendant determined that she was not entitled to LTD benefits. **AR, at 831.** The

Magistrate Judge, after a complete review of the Administrative Record, determined that "the decision of the Plan Administrator was the product of a reasoned and principled decision making process based upon adequate materials and inquiry[.]" **Memorandum and Recommendation, at 23.** Plaintiff argues that these determinations were erroneous and that she should have been awarded LTD benefits for the period lasting from April 3, 2003, to June 1, 2003. ***See*, Plaintiff's Objections, at 12-14.**

Plaintiff bases her objection solely on Dr. Richard Silver's July 14, 2004, addendum to his written report, wherein he opines that Plaintiff was capable of sedentary work between April 3 and June 1, 2003, and could return to light duty on June 1. **AR, at 834; Plaintiff's Objections, *supra*.** This is the same physician that Plaintiff devotes substantial energy attempting to discredit in all other respects both before the Magistrate Judge and this Court. ***See, e.g.*, Plaintiff's Objections, at 2, 9, 11-12; Memorandum and Recommendation, at 6, 19, 25.**

The question is not whether there is *any* evidence that would have supported granting benefits to Plaintiff between April 3 and June 1. Rather it is whether Defendant's denial of Plaintiff's claim for LTD benefits was supported by substantial evidence and was the result of a deliberate and

principled reasoning process. ***See, e.g., Stup, supra.*** Having reviewed the entire Administrative Record, the Court finds that the denial of benefits for the period April 3, 2003, through June 1, 2003, was supported by substantial evidence, which requires the evidence to amount to "more than a scintilla but less than a preponderance." ***Newport News Shipbuilding & Dry Dock Co. v. Cherry*, 326 F.3d 449, 452 (4th Cir. 2003) (citations omitted).** The Court also finds no error in the Magistrate Judge's determination that Defendant's denial of LTD benefits, including a denial of benefits for the period April 3 through June 1, 2003, "was the product of a reasoned and principled decision making process based upon adequate materials and inquiry, and was consistent with the purposes and goals fo the Plan." **Memorandum and Recommendation, at 23.** Plaintiff's objection is, therefore, rejected.

Plaintiff next argues, without any reference to the Memorandum and Recommendation, that a functional capacity exam from July 25, 2003, "was not necessary proof of disability." **Plaintiff's Objections, at 14.** The Magistrate Judge made no such finding, therefore, there is nothing for the Court to review. Plaintiff's "objection" is without any basis and is rejected.

**Plaintiff's Objections, at 14;** *Thomas, supra*; *Battle, supra*; *Aldrich,*
*supra.*

Plaintiff's next objection also fails to reference the Memorandum and
Recommendation, much less specify to which particular portion her
objection applies.  Instead, she chooses to argue that "[t]he Plan does not
require a claimant to offer proof of 'residual functional capacity[,]' [but]
[n]onetheless, Plaintiff's proof of *disability* included substantial evidence of
residual functional capacity."  **Plaintiff's Objections, at 16.**  Although, the
Magistrate Judge may have remarked on his belief that Plaintiff had failed
to submit evidence of residual functional capacity, he never made a finding
that (1) the Plan required such evidence, or that (2) any failure by Plaintiff
to present such evidence was the reason for recommending summary
judgment in favor of Defendant.  Even assuming, *arguendo*, the validity of
Plaintiff's assertion that she submitted proof of her residual functional
capacity, the labeling of this information in such a fashion does not change
the outcome of this matter.  Plaintiff's objection is, therefore, rejected.

Plaintiff states, "The Findings of Plaintiff's Own Physicians Does [sic]
Not Support the Plan Administrator's Ultimate Conclusion."  **Id., at 18.**

Specifically, "Plaintiff objects to the Memorandum and Recommendation finding that Dr. Jon Silver's findings are in any way inconsistent with Plaintiff's disability claim."[11]  **Id., at 19.**

While this "objection" essentially "does nothing more than state [a] disagreement with [the] magistrate judge's" interpretation of the evidence and his suggested resolution, the Court has nevertheless considered the possible merit of Plaintiff's objection.  **Aldrich, 327 F. Supp. 2d at 748.** The Court has found none.

First, contrary to Plaintiff's intimation at the beginning of her objection, there is no "treating physician" rule in ERISA; even if there was absolutely no support in the reports of Plaintiff's treating physicians for a finding of "no disability," Defendant would not necessarily be required to grant her benefits.  **See, e.g., Black & Decker Disability Plan, 538 U.S. at**

---

[11] The Court is somewhat confused by Plaintiff's statements in her objection.  She begins by stating that the findings of her physicians do not support a denial of benefits.  However, her first sentence under this objection states that the findings of her doctors do not create a conflict in the evidence.  The Court is unclear how the opinions of her physicians can neither be in line with nor opposed to those of Defendant, its administrator, and its consultants.  Nevertheless, even if there were a complete conflict in the evidence, it is not an abuse of discretion to resolve a conflicted record in favor of denying benefits.  **See, e.g., Elliott v. Sara Lee Corp., 190 F.3d 601, 607-08 (4th Cir. 1999).**

**834.**  Second, as noted by the Magistrate Judge, there *is* some level of support for Defendant's decision in the records of Plaintiff's treating physicians.  ***See*, Memorandum and Recommendation, at 23-24.**  For example, after her October 2002 surgery, which was, by all accounts, successful, Dr. Jon Silver could find nothing requiring further surgical intervention despite sending her for a battery of tests.  ***See, e.g.*, AR, at 175-76, 658-61, 677, 688.**  He was "not sure what to make of this" when Plaintiff persisted in her pain complaints.  ***Id.*, at 31-33, 667.**  In regards to her complaints of pain, the records show that *Plaintiff* reported her pain as only a 3-4 on a scale of 10; that an epidural steroid injection in July 2003 "abolished" her pain, with Plaintiff reporting her pain level as a 0 out of 10 post-injection; and that a subsequent trigger point injection also gave relief.  ***Id.*, at 710-11, 712, 814.**  Finally, Dr. Burke noted that Plaintiff performed at "submaximal *effort*" on a July 2003 functional capacity evaluation.  ***Id.*, at 814 (emphasis added).**  A fair and reasonable view of this evidence shows that while Plaintiff experienced some level of pain, she was not suffering from a disability so severe so as to prevent her from performing the requirements of her position.  That Plaintiff would prefer a view of the record more favorable to her position does not make the Magistrate

Judge's findings, or the Memorandum and Recommendation in general, erroneous.  This objection, likewise, is rejected.

Finally, "Plaintiff objects to the Magistrate's finding that Plaintiff was malingering and overstating the vocational impact of her pain."  **Plaintiff's Objections, at 20-21.**  No such "findings" are contained in the Memorandum and Recommendation; rather, the Magistrate Judge stated these were reasonable inferences that *could* be drawn from the evidence in the Administrative Record.  **Memorandum and Recommendation, at 22, 24.**  As the "findings" objected to by Plaintiff do not exist, there is no meritorious objection.  ***See generally*, Memorandum and Recommendation;** *Diamond, supra*; *Thomas, supra*.

The Court, therefore, adopts the Memorandum and Recommendation filed herein and grants summary judgment to the Defendant.  The only issue remaining in this case is the Plaintiff's claim for statutory penalties pursuant to 29 U.S.C. § 1132(c)(1)(B) for the Defendant's alleged failure to disclose information.  Given the Court's ruling on the Plaintiff's ERISA benefits claim, the Court will require Plaintiff to advise the Court whether or not she intends to pursue the claim for statutory penalties.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's motions to compel and  for summary judgment as to her ERISA benefits claim is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's cross-motion for summary judgment on Plaintiff's ERISA benefits claim is **GRANTED**.

**IT IF FURTHER ORDERED** that Plaintiff advise the Court by written pleading on or before **APRIL 14, 2006**, if she intends to pursue her remaining claim under 29 U.S.C. § 1132(c)(1)(B).

Signed: March 31, 2006

Lacy H. Thornburg
United States District Judge